B. Frank MACKEY *v.* STATE of Arkansas

CR 74-102                                   519 S.W. 2d 760

Opinion delivered January 20, 1975
[Rehearing denied March 24, 1975.]

*Wright, Lindsey & Jennings,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *Gary Isbell,* Asst. Atty. Gen., for appellee.

LYLE BROWN, Justice. Pulaski County Judge B. Frank Mackey was convicted of violating the county purchasing procedure act. Ark. Stat. Ann. § 17-1601 *et seq.* That act requires bidding on most county purchases where the estimated purchase equals or exceeds $1,000. It also prohibits a purchasing official from splitting any item with the intent to avoid bidding procedures. The four indictments on which Judge Mackey was convicted may be summarized as follows:

Indictment 77664 charged that appellant on eight separate days in September, 1973, purchased corrugated metal pipe with the intent of splitting a single purchase of $5,-325.48 into eight separate purchases under $1,000 to avoid bidding procedures.

Indictment 77666 charged that appellant on seven separate days in July, 1973, purchased corrugated metal pipe with the intent of splitting a single purchase of $6,083.78 into seven separate purchases under $1,000 to avoid bidding procedures.

Indictment 77668 charged that appellant on August 9, and 14, 1974, purchased a quantity of culvert with the intent of splitting a single purchase of $1,802.82 into two separate purchases under $1,000 to avoid bidding procedures.

Indictment 77671 charged that appellant purchased personal property assessment forms at a total cost of $8,068.72; and that eight separate orders were made, splitting the orders in amounts under $1,000 to avoid bidding procedures.

For reversal appellant contends (1) that the actual purchases described in the indictments were made by people other than appellant and that the sole participation of appellant was the approval of the claims for the purchases;

(2) that the State failed to prove criminal intent; and (3) that it was error to give an accessory instruction.

The first witness called by the State was Frank Winburne, a certified public accountant who had been retained by the grand jury to audit the county records with regard to a multitude of purchases. Through him was introduced a summary of the purchases described in the four indictments. From a study of those records and conferences with county officials and employees he ascertained that no bids were taken on the purchases described in the four indictments. He further ascertained that the orders described in the first three indictments (metal pipe culverts) were all placed with the manufacturers by appellant's employees; that the order for the assessment forms was placed with the printing company by the county assessor; and that appellant had nothing to do with the purchases except to pass on the claims filed by the sellers.

Official county records of the involved purchases were introduced through the county clerk. The amounts of the purchases are not questioned, nor is it contended that bids were taken. Mr. Al Stafford, owner of Arkansas Culvert Company, verified the purchase and delivery of the metal pipe and culverts. The witness said he had no dealings with appellant in connection with any of the purchases. He assumed that the orders were placed by the county road and bridge supervisor, W. T. Morgan. Witness Robert E. Hill, representing Democrat Printing and Lithographing Company, produced the records of purchases of personal property assessment forms which formed the basis of the fourth indictment. He verified the amount of each invoice and delivery. He testified that the purchases were made by L. E. Tedford, the county assessor. "All Judge Mackey had to do with the purchase was that he ultimately had to pay for it."

The county comptroller, C. B. Rotenberry, described the procedure for processing claims against the county. The supplier makes out one claim form for supplies furnished during a given month. He attaches thereto the various invoices supporting the total amount of the claim. The invoices are checked by the comptroller and he satisfies himself that the purchase has been authorized, the products delivered, and the correct billing extended. Thereupon the comptroller af-

fixes his signature on the outside of the claim form below this imprint: "The within claim, together with all written and printed matter thereto attached, have been by me carefully examined and checked, and same is hereby certified as correct in amount, and a legal demand against Pulaski County in the sum of $ _____." Below the comptroller's signature is this printed form: "Examined and the sum of $ _____ allowed out of appropriation for expense of _____ this ____ day of _____, 19 ____.

County Judge."

Mr. Rotenberry testified he examined the invoices supporting the claims upon which the first three indictments were based and saw no reason not to approve them. He said he noted that the purchases were made on different invoices with different dates of purchase; that each invoice was under the limits requiring bidding, and he considered them separate and distinct purchases. With reference to the assessment supplies he said he contacted the county assessor and verified the invoices before approving the claim therefor.

The State also called Theron Morgan. He has worked for Pulaski County under the last five county judges. His work is principally concerned with bridge and road construction and repair. Since 1969 he has been the road and bridge commissioner, working, of course, under the direction of the county judge. He verified having made the purchases described in the first three indictments and related the three particular jobs to which the materials were assigned. In fact he said he had been doing the purchasing for road and bridge work for the past 23 years — "18 years under Judge Campbell and five under Judge Mackey". In that capacity he executed the purchase orders and approved the invoices when they were filed with the county, usually at the end of the month. After his (Morgan's) approval "Mr. Rotenberry gets it from there, checks it out and then presents it to the judge". He asserted he was sure that "all this culvert was in the ground with water pouring through it before Judge Mackey knew the culvert had been bought".

Witness Morgan described his method on construction projects, which can be reasonably interpreted as some explanation for "installment" purchase of materials: "When we

start to repair a road like these three, we figure out what material we are going to use as we go along. We do not put our plans on the drawing board. We have a road built before most anyone else could get it on paper. We travel a road and figure out ahead of time how many culverts we are going to use. We know in general terms where our trouble spots are. Then we have to figure out the square foot area of culvert that will be required as we go along."

Appellant B. Frank Mackey testified that with an annual budget of over three million dollars he had to rely on employees for much of the paper work required of the office. For that reason he said W. T. Morgan was authorized to make purchases for the road and bridge department and the comptroller, Mr. Rotenberry, was counted on to audit all invoices for purchases of any nature. In addition, a full-time state auditor is assigned to Pulaski County. The witness said the state auditor, who goes over all county accounts, had never criticized the purchasing procedures. He said the first knowledge he had of the purchase of the materials in question was when the claims reached his desk. He said he noted they were approved by Mr. Rotenberry as being a just claim, that he examined the claims and saw nothing to indicate there was any problem with regard to the manner in which the purchases had been made. With respect to the purchase of assessment forms, again he said he had no connection with the actual purchase. He testified that it was approved by Mr. Rotenberry and initially authorized by the county assessor, and he relied on the latter to conform to the purchasing requirements.

Other than evidence of the four transactions forming the basis for the four indictments there is evidence of divers other transactions which generally followed the same pattern as those forming the basis of the four convictions. For example, there was evidence of a lease-purchase contract for a bulldozer costing $51,081; there was evidence of the purchase of asphalt sealing materials for $2,750; and there was evidence of a transaction with Dixie Culvert Company dated July 5, 1973, for a total of $1,802.58 which was split into two invoices. We are unable to tell whether the recited additional transactions were introduced to support indictments which were dismissed during the course of the trial; or to support in-

dictments wherein the jury returned verdicts of not guilty; or to substantiate the indictments wherein the jury was unable to reach a verdict. Additionally, the transactions may have been introduced to show an overall scheme of operation. Our dilemma is caused by the fact that only those indictments upon which convictions were returned are in the record. Other indictments are referred to only by case number. However, since the State's own evidence relative to the four purchases forming the basis of the convictions shows that those purchases were made, not by Judge Mackey, but by Mr. Morgan and Mr. Tedford, evidence of other transactions are of no benefit. We shall have more to say about that later.

The county purchasing procedure act imposes a penalty on an official who *intentionally* violates the provisions of the act. Ark. Stat. Ann. § 17-1613 (Repl. 1968). The State did not produce a single witness to testify that splitting practices were followed. The State relied solely on the suspicious fact that on eight separate days in September, 1973, corrugated metal pipe was purchased, each purchase order being under $1,000; that on seven separate days pipe was purchased, each order being under $1,000; that on August 9, and 14, 1974, two purchases were made, each under $1,000; and that nine separate invoices were approved for the purchase of tax assessment forms. It is significant that the suspicion is not corroborated by proof of fraud, personal gain, or a showing that the suppliers were paid more than the fair market price for the products. Of course, bare suspicion of guilt is not enough and we hold that the State did not meet its burden of proof; in other words, we find no substantial evidence of guilt, either as a principal or accessory, of intentional violation of the act.

Another controlling factor contributing to our action is that Judge Mackey, in approving the claims, was acting in his capacity as presiding judge of the county court. The acts of approving the claims did not constitute purchases; the purchases had already been made during the months previous to their approval. The legislative act of which he was accused of violating has a single purpose, that of regulating *purchasing* procedures; hence the title of the chapter, "County Purchasing Procedure". The appellant was tried on the

theory that he violated the purchasing act by splitting purchases. Ark. Stat. Ann. § 17-1603 (d) (Repl. 1968). The overwhelming proof was to the effect that appellant's sole participation was in approving claims for purchases made by other parties, and there is no evidence of conspiracy between the judge and those making the purchases. In fact the grand jury specifically found no evidence of fraud.

Finally, the State argues in essence that appellant is criminally liable for the acts of his subordinates. To support that contention it cites *Russell v. Tate,* 52 Ark. 541, 13 S.W. 130 (1889). That case holds that the mayor was *civilly* liable for ordering the payment of an illegal appropriation. Also cited is *Davis v. Jerry,* 245 Ark. 500, 432 S.W. 2d 831 (1968). That was a civil proceeding. We there held that the county judge should be enjoined from failing to follow the county purchasing procedure act. Even if there might be circumstances under which a county judge could be criminally liable for the acts of his subordinates we cannot agree that such liability should be attached under the facts in this case. In fact the only Arkansas case in point which has been called to our attention does not favor the State's position. *Robinson & Warren v. State,* 38 Ark. 641 (1882).

Reversed and remanded.

GEORGE ROSE SMITH, JONES and BYRD, JJ., dissent.

CONLEY BYRD, Justice, dissenting. The County Purchasing Procedure Act, Acts 1965, No. 52 provides:

"Ark Stat. Ann. § 17-1601. 'From and after the passage and approval of this Act it shall be unlawful for any County Official within the several counties of the State of Arkansas to make any purchases with county funds in excess of $1,000.00, unless the hereinafter method of purchasing is followed. ...' "

Under Section 2 of the Act, Ark. Stat. Ann. § 17-1602(d) the Act provides:

"*Purchase* shall mean and include not only the outright purchase of a commodity but also the acquisition

of commodities under rental-purchase agreements or lease-purchase agreements. . . ."

Subsection (b) of Section 2 [Ark. Stat. Ann. § 17-1602 (b)] makes the following requirement:

*"Commodities* shall mean all supplies, goods, material, equipment, machinery...purchased for or on behalf of the county."

Section 3 of the Act [Ark. Stat. Ann. § 17-1603] provides:

"All purchases of commodities made by any county purchasing official with county funds, except those specifically exempted by this act, shall be made as follows:

(a) 'Formal Bidding' shall be required in each instance in which the estimated purchase price shall equal or exceed $1,500.00.

(b) 'Informal Bidding' shall be required in each instance in which the estimated purchase price shall equal or exceed $1,000.00 but be less than $1,500.00.

(c) 'Open Market Purchases' may be made of any commodities where the purchase price thereof is less than $1,000.00.

(d) No purchasing official shall parcel or split any item or items of commodities or estimates, with the intent or purpose to change the classification or to enable the purchase to be made under less restrictive procedure."

Section 5 of the Act [Ark. Stat. Ann. § 17-1605] provides that all contracts shall be let to the lowest responsible bidder. Section 7 requires the purchasing official to make every effort to notify all eligible bidders before purchases are made. Section 8 requires all bids to be open in public and read at the time and place specified. Section 9 [Ark. Stat. Ann. § 17-1609] makes the following requirement:

"(a) No contract shall be awarded or any purchase made until the same has been approved by the County Court, and no contract shall be binding on any county until the County Court shall have issued its order of ap-. proval.

(b) The Order of the County Court shall be properly docketed, and all documents and bids pertaining to the solicitation of bids and awarding of contracts under the purchasing procedure of this act shall be filed with the County Clerk, together with the order of the court which shall be filed by said County Clerk.

(c) No claim filed with the county for payment of any commodity, the purchase of which is regulated by this act, shall be paid, or no warrant shall be issued by the county clerk for the payment of same, until the order of the county court approving same shall have been issued and filed with the county clerk."

Before passing to the facts, I should here note that while Ark. Stat. Ann. § 17-1609, *supra,* has to do with the approval of a contract before a purchase is made, the procedure for filing, presenting and allowance of claims by the County Court is regulated and controlled by Chapter 7 of Title 17 of the statutes — see Ark. Stat. Ann. § 17-701 et seq.

Now on the facts appellant readily admitted that he had allowed claims against the county in excess of THREE MILLION DOLLARS and that the County Purchasing Procedure had been followed only three times in the taking of bids. The State produced a lease-purchase contract signed by B. F. Mackey, County Judge on March 20, 1973, whereby the county acquired a D-6 Bulldozer at a total cost of $51,081.00. Frank Winburne, the accountant hired by the County Grand Jury to investigate the County's purchasing procedure testified that he attended a meeting wherein appellant, Therion Morgan, Conrad B. Rotenberry and Mr. Tedford, the Pulaski County Assessor, were present. When asked about the purchase of the bulldozer without bids appellant took the position that the equipment was used (Tr. 59). Mr. Morgan stated it was new. At the trial appellant readily ad-

mitted that no bids were taken on the lease-purchase of the bulldozer but at that time took the position that the bulldozer was actually purchased in 1972, which would have barred an indictment on that item because of the one year statute of limitation.

On cross-examination appellant admitted that he had purchased from American Coating Company a slurry seal of asphalt for Mission Road in the amount of $2,750.00 without requiring bids. He justified this on the basis that it was an experiment. However he admitted that the vendor had been trying to get him to try his product for four years.

Appellant's only explanation for not requiring bids on the county assessment forms was that he relied upon Mr. Tedford to conform to whatever purchasing requirements there were. Since the majority has touched so lightly on the assessment form purchase that it is impossible for me to comprehend what actually transpired, I undertake to set the matter out in some detail.

State's Exhibit No. 9 shows that on September 18, 1972, *Requisition No. 7356,* was given to Democrat Printing & Lithographing Company for 62,000 "Sets Quad Personal Assessment Lists for 1973." On January 15, 1973, the Democrat Printing & Litho. Co. presented its claim to the County Court for payment in the amount of $8,068.72. Attached to the claim were invoices which referred to "YOUR NO. req. 7356" and showed the following information.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11/14/72 | 7500 sets Personal Assessment Blanks | | | | | | $947.62 |
| | | | | | | tax | 28.43 |
| | | | | | | | 976.05 |
| 11/22/72 | " | " | " | " | " | | 947.62 |
| | | | | | | tax | 28.43 |
| | | | | | | | 976.05 |
| 11/29/72 | " | " | " | " | " | | 947.62 |
| | | | | | | tax | 28.43 |
| | | | | | | | 976.05 |
| 12/5/72 | " | " | " | " | " | | 947.62 |
| | | | | | | tax | 28.43 |
| | | | | | | | 976.05 |

| 12/11/72 | 7500 sets Personal Assessment Blanks | | | | | $947.62 |
|---|---|---|---|---|---|---|
| | | | | | tax | 28.43 |
| | | | | | | 976.05 |
| 12/15/72 | " | " | " | " | " | 947.62 |
| | | | | | tax | 28.43 |
| | | | | | | 976.05 |
| 12/18/72 | " | " | " | " | " | 947.62 |
| | | | | | tax | 28.43 |
| | | | | | | 976.05 |
| 12/20/72 | " | " | " | " | " | 947.62 |
| | | | | | tax | 28.43 |
| | | | | | | 976.05 |
| 12/22/72 | 2,000 sets personal | | | | | 252.74 |
| | assessment blanks | | | | tax | 7.58 |
| | | | | | | $260.32 |

On January 15, 1973, Mr. Tedford issued another requisition No. 8255 to Democrat Printing & Lithographing Co. for "see Attached invoices" in the amount of $8,068.72. The attached invoices were the invoices above described. Thus we see that there was no splitting of purchases by Mr. Tedford. The splitting was done by Democrat Printing & Litho. Co. which was obvious from the information presented with the claim.

Other invoices in the record include the presentation and allowance of a claim from Dixie Culvert Manufacturing Co., in the amount of $1,802.58, that was charged to "Road & Bridge." Those invoices show that both invoices were dated "7-5-73". One was #87476, and the other was #87477. Invoice #87477, was in the amount of $526.54 and invoice #87476 was in the amount of $1,284.82. These purchases were admittedly made without taking bids.

After appellant had admitted that in August 1973, the county had purchased $2,664.61 worth of steel from AFCO Steel Company without taking bids, the record on cross-examination shows the following:

"Q. When a new road is sought to be built or a new

bridge is sought to be built or one is sought to be rebuilt, who has final approval of whether it will be done and how it will be done?

A. Mr. Morgan has final approval over how it will be done, and he and I usually talk together about these things and determine when and how it ought to be done.

Q. You mean, you avail yourself of his professional services in deciding whether or not to do it?

A. Yes; sir.

Q. Did it occur to you when you purchased that steel from AFCO that it was over a thousand dollars?

A. I didn't know it until the invoices reached my desk.

Q. Did you bring that to the attention of Mr. Morgan?

A. No, sir; because I knew it went into a bridge and I knew where the bridge was being constructed that it went into.

Q. Did you advise him in the future not to do that?

A. No, sir; I did not.

Q. Have you ever advised him not to make purchases over a thousand dollars without taking bids?

A. He has knowledge of that, sir.

Q. He has knowledge. Have you advised him?

A. Yes, sir.

Q. When did you advise him?

A. I don't remember the exact date.

Q. Within the last five years, I assume?

A. I'm sure it was; yes, sir."

I submit that the record contains more than substantial evidence to sustain the conviction herein—in fact it looks to me that it is supported by the overwhelming evidence.

For these reasons I respectfully dissent.

GEORGE ROSE SMITH and JONES, JJ., join in this dissent.